Good morning, your honors. My name is Louis Stober. I am the attorney for Mr. Blaze. This is a case of a black employee who had best engaged in, as security said, an unintentional change in timesheets and mistakes but was fired, yet the comparators given by Verizon were all individuals who had deliberately, intentionally falsified records to either deprive employees of overtime or to add additional time to employees who did not work. I thought there was only one comparator that really fit within the category. Actually, there were no comparators. The comparators they raised included Mr. Archie Saris, who admitted that he had intentionally falsified time records of his employees to deprive them of overtime because he was mad at them. Mr. Blaze. You said that these were unintentional falsifications? I didn't say falsifications. I said unintentional alterations to the timesheets by Mr. Blaze. That's what security found. Which happened to be falsifications, right? They wouldn't be falsifications. As security said, that if you look at 298, the changes attributed to Mr. Blaze did not change his satisfactory productivity ratings. Security also said that they could not substantiate that Blaze made the changes to increase his productivity numbers. But you're saying he didn't even know he was changing them? He knew that he was changing them on three occasions. But it's not unintentional. It's unintentional in that he did not intentionally seek to increase his productivity numbers. But you said it was unintentional changes in the record. Correct. Unintentional. He knew he was changing them. Didn't he acknowledge that he — He acknowledged that he changed them on three different types of occasions. One, where he went over them with the union and the employee. Or two, where the timesheet got bounced back for a duplicate code. Or three, if a tech made an error on his timesheet or didn't put it in a code. That's at the record page 347, 350, and 312. In each of those occasions, it was not his intent to either boost his productivity numbers or deprive any employee of overtime. But in the third category, what is he supposed to do under the rules? That is to say, if someone under his supervision submits what he believes is an inaccurate or incomplete timesheet, is he authorized to unilaterally make changes? Or is he supposed to either talk to the employee and turn it back until the employee decides whether to make a change? Or report it up the chain of command that the employee had submitted something inaccurate? Is there any rule to that effect or not? 3.1.1 states, you, Mr. Blaze, must resolve discrepancies in any records and make appropriate corrections. The rule itself doesn't say he must go up the chain. So the rule authorizes him, you're saying, to make the changes? Yes. And what I believe in this particular case, what happened was security finding that he did not engage in any misconduct. He did not seek to deprive somebody of overtime. He did not seek to improve his satisfactory rating because they said this didn't change his satisfactory rating. But it did. It did change employees' overtime, did it not? Actually, the security at page 302 says, Mr. Blaze's direct reports gave no indications they were not properly paid for the overtime they worked. In addition, when asked, and you can check the record, I've looked at it, Verizon has not presented a single document showing any technician who did not get overtime who was reporting to Mr. Blaze. They make the allegation, but they don't substantiate it. And that's one of the points in my deposition from pages 716 to 735, where I specifically asked the security, show me the documents, show me where they were deprived of overtime, and they could not do so. So we have falsification upon falsification. When you look at the truth of what the report demonstrated, you then have Susan Williams-Sias, the head of HR, who's also Caucasian, elevating the security report that said that they had all, that Mr. Blaze had altered timesheets. She then claims that he falsified documents. Now, I will also point you to security's own statement at 310 in the Brabant investigation that, quote, there were no indications Mr. Blaze knowingly removed or withheld any overtime from anyone by reducing overtime they worked. Again, confirming he did not. I thought the I thought the arguable and arguable motivation, although he did not acknowledge it, was to to give the impression of increased productivity. No, that was also unsubstantiated. The security said that there was no evidence that he made any changes to increase his productivity results. The only thing that was done was sometimes if an employee had an overlap on his installation and repair jobs, they Mr. Blaze would change it to make it correct so that the time that was spent on installation and the time on repair. So there was no overlap. You couldn't say that I spent. He couldn't be doing both at the same time. Exactly. And that's what he testified to in his deposition as well. By contrast, and by the way, within a month and a half after the investigation report came out, Mr. Blaze is fired and he's fired and deprived of his bonus. He's also fired before they had a second chance to interview William size and Sarah's. I'm sorry. It's size is the is the head of H.R. And only after Miss Susan Williams size went to. V.P. Jones and Director Connelly and said to them, this guy falsified records. She also said in the EEOC affidavit at page 410, security concluded Blaze was guilty of timesheet falsification. This entire case has been based on Mr. Blaze falsified records and therefore should be fired when the Saris, who did falsify records, had nothing happened to him until after Blaze was fired and complained. Why wasn't Saris? The only thing that happened to Saris was he got transferred to Bohemia, which was closer to his home and allowed to take time off and no explanation given why they took so much time was fired ultimately, ultimately, but only after the complaints by Blaze saying why me and not him when he actually engaged in intentional acts. All I did was try to do the company thing and correct records. And as I said, all the rest of the records that Verizon produced in this record of other white employees who were fired, each and every one of them, as we point out, are brief where individuals who are fired for intentionally and deliberately falsify records to either add hours to employees or take hours away from employees. Not a single employee can Verizon show was fired for an unintentional act or mistaken act as Mr. Blaze was. So the record shows if you're black and you engage in a mistake or an unintentional act, you get fired. The only way the white employee gets fired is if you engage in intentional falsification. We believe that the record amply demonstrates enough time is spent by Verizon to hide the true intent to get rid of Mr. Blaze that we should be allowed to go before a jury and present this evidence. Unfortunately, Judge Brown adopted the falsified records and intentionally act standard when he when he ruled against us. We submit that was an error. Unintentional acts are not the same as intentional acts. And I think you'd be clearer if you did not refer to them as unintentional acts. They're intentional acts. What you are what you are saying really is acts made with a bad purpose as opposed to ones made without a bad purpose. That's the distinction you're drawing. That's what I'm trying to say. He did not intend any wrongdoing by the acts, whereas the other individuals that that Verizon cites to all did deliberately seek to engage in a wrongful act. And therefore, the cases that Judge Brown cited all dealing with individuals who deliberately falsified to engage in a misconduct act should be fired. Mr. Blaze didn't do that. We ask that you allow Mr. Blaze to go back and present his case to trial. Thank you, Mr. Stover. OK, you've reserved two minutes for rebuttal. Mr. Wexler, good morning. May please the court. Good morning, Your Honors. My name is Howard Wexler from Cypher Shaw on behalf of the appellee Verizon New York Inc. There is no evidence in this record to support any determination that the decision to terminate Mr. Blaze was made under circumstances giving rise to an inference of discrimination. In terms of how we got here, he makes out his prima facie case, right? Yes. The first three he meets as Judge Brown, his decision said. So there is at least evidence from which that prima facie case can be concluded. Now, tell us why Mr. Sober is wrong. Sure. A few points. First, the intentional unintentional. There's no dispute that Mr. Blaze made these edits. Verizon's timekeeping system is such that a technician hands in a written timesheet and the manager uses a computer and enters a time. But is there a rule? This is the question I asked Mr. Sober. I thought that he accurately reported that, as I read the rule, that it puts responsibility on the supervisor to make sure that what is put into the system is accurate. So what is, is there any rule that when a supervisor thinks that something the employee has submitted is inaccurate, the supervisor is not permitted to make a change on the timesheet, but has to do something else? There's a comment section, Your Honor, and Mr. Blaze attended numerous trainings, most recently in 2014, regarding Verizon addition to co-training, the code of conduct. There's manager training on timekeeping. There's a comment section. And in his own statement to security that Mr. Blaze himself authored and sent to security, he acknowledged that he did not do a good job documenting his changes, because what he did was take away time from certain jobs. And maybe he did so with an innocent motivation, but he didn't document what he was doing. So when security looked at the timesheets, all 62 of the ones that they reviewed, 27 of them were changed by Mr. Blaze with no indication as to why he was doing what he did. And there is evidence in the record. And how is that mechanically done? How are, what is the supervisor physically supposed to do? You said that the employee, the underling, the worker, fills out a paper timesheet saying so many hours doing such and such. Yes, Your Honor. If, and then the supervisor inputs that to the computerized system? Yes, Your Honor. And what, did, did Mr. Blaze put in, just simply put into the computer different numbers than, or different accounts than was on the paper sheet? Yes, Your Honor. Or did he erase what they submitted and change the underlying record? Sure. The technician has the paper timesheet and they hand it in to their supervisor at the end of the day. Then a manager, supposed to be every day, takes that, those written timesheets, sits down at his or her computer and types in the information. He was, this technician had four jobs. He was doing an installation at this address for two hours, an installation at this next address for three hours, and types in the start and stop times. If there's a change from what the technician put in the timesheet, there's a comment section so that you should write, adjusted, so if there is an error. A comment section in the computer or a comment section on the sheet itself? In the computer. In the computer where, where there's entry. And this way, if someone looks back at the records, they could see why a change was made. Mr. Blaze didn't do that. And in his own statement to security, twice he acknowledged that he did not do a good job in documenting why those edits were made. So that when they provide. I thought, and just tell me if I am, if I have the wrong impression of the record, that there is some evidence that there's two sets of handwriting or altered handwriting on the written documents. Is that not right? No, I believe there, there's the written timesheets and then there's the computer. And ultimately. Mr. Blaze did not, or he did, make written changes on the technician's timesheets? No, he would just take the written timesheets and then enter that into a computer and. He entered different information in the computer than was on the timesheet. Correct. Both. So, so a question that was asked that I don't think you've answered is, is, was there a, a, a requirement in the company's policies that, that, that when this happens, when a, when a supervisor changes the numbers, enters into the computer numbers that are different from the numbers on the technician's timesheet, that a comment be filled out to explain why this was done? Yes. And Mr. Blaze was trained on that. There's a, a, a flash, which is something that's sent out via email to managers regarding different policies. So numerous flashes went out to managers on timekeeping. In addition to a PowerPoint training that we produce that's in the record. What did they say? Can you quote what those? Sure. You're supposed to document all changes that you're supposed to edit and put narratives in there. One of the other issues. Where do we find that? Where do we find that require the flash that, that, that the flashes that give that requirement? Sure. I can find that for your honors in one moment in the record, but that's a training and Mr. Blaze received that training in addition to a training that he took on code of conduct and supervising eligible associates. He took that training on 2-20-2012 and that's in his training history. And the PowerPoint from that training was something that Mr. Blaze was showing during his deposition. In terms of the comparator evidence, um, it's simply not true that all of the other comparators that we produced evidence about. I'm sorry, I had asked you, where do we find the, the, the, the flash that the flashes that explain that you must fill in the comment? Sure. Your honor, uh, in the record, it's, uh, the June 19th, 2014 flash report. Uh, that was exhibit M, uh, it's part of the record page 53. Uh, the flash report talks about productive time, nonproductive time, because part of the issue was. Is this in the joint appendix? Yes, it's in the joint appendix. Now that's what I'm, what page is it? Yes. Um, I don't have that right now in terms of where it is. You know, the, the, there's a certain problem here in that in the red brief, uh, at page 18, this is not relevant to this, directly relevant to this particular question that Judge LaValle was asking. Uh, you represent that all 12 field technicians security, uh, interviewed denied that Brabant created a hostile work environment. And there's a general citation to the, uh, uh, some of the documents about those people, uh, in the reply brief, uh, Mr. Stober claims that in fact, uh, almost all of them said the opposite. And when I checked that one out, his account seemed more accurate than yours. Do you have any explanation for that? Was that, am I misreading those documents that Mr. Stober cites in the reply brief? Your Honor, of those 12 technicians who were interviewed, more than half said that they did not believe that Patty Brabant had submitted. And that's in there. More than half is a lot different than the 12 all denied. Sure. And the ones that said they had issues with Patty Brabant there, we produced their interview notes and those interview notes say one of them, for instance, said that there was an issue where, uh, after the work stoppage, there weren't enough tablets available. So it wasn't a hostile work environment in terms of, and that was investigated and that was determined that it did not create a hostile work environment, but there was an investigation. You might understand why I am interested in finding the actual flesh that you're referring to somewhere in the joint appendix to make sure that it says what you say it says. Sure. I understand that, Your Honor. Um, and it is in there and the, and it says even in section 3.1.1 of the code, which is the code violation that he was terminated for. It states it is an also improper to intentionally take any action that leads to the creation of a false or misleading record, um, such as withholding information or providing incomplete information. Um, and then it talks in the training about making the notation, but it wasn't just in terms of the timesheets. He also changed time between productive and nonproductive time. And the rule is, and then that flash as well for nonproductive time, there needs to be a narrative and Mr. Blaze did not put in a narrative. So will you give us the, the, uh, citation for that as well? That's that same flash, that same workplace flash. And also in the PowerPoint presentation, uh, that he received as part of history, page by page documentation of where we find it in the appendix, all the things that show that the changes that he made were violations of written company policy that was communicated to him. I understand your honor. Um, I can, and the issue here, I just want to get to briefly before my turn is up, uh, in terms of the evidence of discrimination is that here, the decision maker was Walter Jones and Mr. Jones testified, whatever issue with Messiahs, Mr. Jones testified that he took terminating a manager very seriously. He conducted his own investigation. He reviewed the security report. He reviewed Mr. Blaze's learning history. He reviewed his performance evaluations because he wanted to make sure that Mr. Blaze was treated fairly. And Mr. Jones, who's the same ethnicity and only a few months younger than Mr. Blaze made the decision to terminate his employment. Mr. Connolly, who's one of the individuals who the plaintiff who Mr. Blaze alleges had some sort of discriminatory animus actually helped Mr. Blaze write his appeal letter to Verizon. Mr. Connolly liked Mr. Blaze and understood, but he also understood that given the nature of the violation here and that Verizon had in fact terminated many managers for these type of violations, that Verizon had in fact terminated for this and just briefly in a nutshell, what articulate for me, at least, please, maybe my colleagues have a more fulsome grasp, exactly what it is that Mr. Blaze did that caused him to be terminated. Sure. Your honor, he made changes to time when inputting it into Verizon's computer system that did not match the time that the technicians reported on their timesheets. And as a result of that, without indicating why he made those changes without so that someone looking back could indicate what the changes if he had provided that indication and it was correct. Everything would be copacetic and we wouldn't be here, right? Yes. And briefly, your honor, it's a very good point that I just want to get to Mr. One of the comparators that involved Kent Handel, which he's another manager in the Bronx who was fired for the same violation, the same code. That's why he was fired. He made changes just like Mr. Blaze did, and he didn't put in narrative statements explaining why he was making those changes. And Verizon terminated his employment because if you make changes to timesheets because of the unionized environment that Verizon works in, as well as its responsibilities to make sure that technicians are paid for all of their time. And without showing why you were doing what you were doing, there was no explanation for why those changes were made. And what prompted this complaint were two anonymous reports that came into Verizon from technicians saying that, one, Mr. Blaze was doing this to boost his productivity, and, two, that they were losing pay. So that one of the anonymous, both anonymous complaints that came in, one the last week of August 2014, the other one early September, both were that Mr. Blaze was depriving technicians of pay. And that's why the investigation commenced, and it was Mr. Jones who made the decision. It was confirmed that these technicians actually lost pay that ultimately was, I assume. Yes, in the report it's in there, and then Ms. William Sias, who's the HR representative, was asked about this during her deposition, and she confirmed it. And there's emails between HR and William Sias that were, and in her affidavit submitted, and her declaration, that's showing that there were employees who were underpaid as a result. And there's just no, and here, whether Mr. Blaze agrees with the decision to terminate his employment or not, there's no animus, there's no evidence of discriminatory conduct whatsoever. There's no comments that are alleged, and Judge Brown went through this in his decision in terms of showing there's no pretext, there's no comments, and that there was Verizon's legitimate reason for terminating Mr. Blaze's employment. You have in mind Judge LaValle's request? Yes. For identifying things that, to the appendix that we have in front of us? Yes. How would Your Honors like us to? Could you send us a letter? Of course. By end of the day tomorrow? Of course. Is that satisfactory, Judge LaValle? Yes, that's fine, and the plaintiff should be allowed to reply to that. Right, if there are other things that need to be identified to the appendix. And thank you, Mr. Wexler. Mr. Stober, you have two minutes for rebuttal. First things first, the documents that they claim show that employees were not paid overtime, it's not in the record. You will not find a single document in the record showing that any employee was not paid overtime. What you will find is a security report saying not a single field technician stated that they'd lost any overtime as a result of what Mr. Blaze had done. And I cited to you earlier the page that that's on. Secondly, with regard to his changing of NPT time. That, at least, you would contend is a fact and dispute that. Absolutely. And the other, on the NPT time, you will not find a single document in that record showing where Mr. Blaze changed in NPT time. I ask for that, too. But that's not in the record. There's not a single document in that on either of those. Do you dispute the proposition made by your adversary that it was communicated to the plaintiff that it was a rule that you were not to make the kinds of changes that he made without documenting them by explaining in the comments section why the change was made? I dispute that. The rule 3.1.1 does not state that. And I have not found... I have not seen that. And, Your Honor, with all due respect, if something was in a flash to a training session and not incorporated in a rule with everything else that senior managers get on a daily basis, are they supposed to remember one little flash that was in there? But I have not seen... I have not seen anything in the record. And I could be wrong. I've reviewed this... You rely on the proposition... You rely on the proposition that what he did intentionally was to make changes to make the records more correct. Yes. And that that was authorized by the rule. Yes. And the rule is what? The number... 3.1.1. Say it again. 3.1.1. 3.1.1. And where is that? I believe you can find that at page 304 of the appendix. Okay. Thank you. Also, I just wanted to hit on the Jones aspect before my time is up, and that's Mr. Connolly signed the termination. Ms. Sias brought the information claiming it was falsification. If Mr. Jones did anything, his deposition shows he reviewed what Sias and Connolly had given to him. In addition to that, on February 10th, Mr. Blaze filed an appeal of his termination. And who decided that appeal? Not Walter Jones. It was Ms. Susan Williams Sias. She had the final word. She's the one who denied the appeal. And I can give you the page number of her of her denial as well, if you need that in the record. She I believe that I believe it was right around the point of his appeal letter, which was put in the record at approximately page 353. Looking at page 304, by the way, which you I believe I heard you say was where we would find Rule 3.1.1, and I don't see it there. It looks to be a part of the report about Manager Brabant, Verizon Code of Conduct, etc. But not the code, not the rules. So perhaps you, when you reply or file a letter. Maybe on 273. Is it on 273? At the very bottom of page 304, in the security comment, they quote Verizon Code of Conduct. They said the Verizon Code of Conduct, page 8 states, quote, says Verizon requires all employees to use their judgment, etc., etc. And you must create etiquette records that reflect the true nature of the transaction and activities that they record, including whatnot related to supporting the time of our community attendance and so on. Is 270, will you look at page 273? Sure, sure. Is that what you're talking about? Let's see, 273. Yes, there is the actual quote. Thank you, Your Honor, for quickly and efficiently finding the code. All right. Anything else, Mr. Stober? No, I thank you for giving me the little extra time over the two minutes. And I appreciate your consideration of this case. Thank you both. We'll reserve decision in this. And Mr. Wexler, we'll hear, we'll get a letter from you filed electronically by the end of the day tomorrow? Yes, Your Honor. That works for you? Okay, great. Thank you. We'll reserve decision, as I said. The next.